**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS WELFARE AND PENSION FUNDS, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A.T.M. ENTERPRISES, LTD., an Illinois Corp., | ) | |
| | ) | |
| Defendant. | ) | Case No. 08 C 1074 |
| | ) | |
| _____ | ) | Judge Marovich |
| | ) | |
| A.T.M. ENTERPRISES, INC, an Illinois Corp., | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TEAMSTERS LOCAL 330, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**THIRD-PARTY DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
COMBINED MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

The Trustees of the Suburban Teamsters of Northern Illinois Welfare and Pension Funds

("Funds") initiated this action with their complaint against A.T.M. Enterprises, LTD ("ATM"), based

on an agreement between the Teamsters Local Union No. 330 ("Union") and ATM ("Agreement").

(Compl.¶¶ 4, 5; Def. Stat. Facts. ¶ 4).  The Funds allege, in part, that ATM owes contributions on

behalf of its owner/drivers and/or subcontractors under Article 4 of the Agreement.  (Compl.¶¶ 8,

1

9; Def. Stat. Facts. ¶ 4.)  ATM answered the complaint by denying that it breached Article 4 of the Agreement and asserting that Article 4 is unenforceable.  (Answer at 6-7, 10-11).  At the same time, ATM filed the third-party complaint against the Union pursuant to Fed. R. Civ. P. 14.  Count I of the third-party complaint seeks declaratory judgment that Article 4 is unenforceable.  (ATM Compl. at 3.)  Count II seeks damages from the Union for breaching the Agreement by refusing to sign agreements with ATM's subcontractors.  (ATM Compl. at 4.)

The third-party complaint must be dismissed because declaratory judgment actions cannot be brought pursuant to Rule 14, because ATM failed to exhaust its administrative remedies and because the undisputed material facts show that the Union did not refuse to sign agreements with ATM's owner/drivers or subcontractors as required by the Agreement.[1]

## II.    ARGUMENT – RULE 12(b)(6) MOTION TO DISMISS

When ruling on a 12(b)(6) motion, the Court accepts as true the well pleaded allegations of the complaint and inferences that may reasonably be drawn from those allegations.  *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 495 (7th Cir. 1993); *Dowlatshahi v. Motorola, Inc.*, 970 F.2d 289, 290 (7th Cir. 1992).  The Court may grant the motion only if it is beyond doubt that the nonmovant can plead no facts that would support his claim for relief.  *See Conley v. Gibson*, 355 U.S. 41, 45-46, 47-48 (1957).  ATM's complaint must be dismissed because ATM can plead no facts that would allow it to proceed with a declaratory judgment action against the Union in this proceeding or excuse its failure to exhaust administrative remedies.

### a.    Declaratory Judgment Actions Cannot Be Brought Pursuant to Rule 14

ATM filed the third-party complaint pursuant to Rule 14, which provides, "A defending party

---

[1]Except for quoted portions of pleadings, owner/drivers and subcontractors are referred to here, collectively, as "subcontractors."

may, as third-party plaintiff, serve a summons and complaint on a nonparty *who is or may be liable to it for all or part of the claim against it*." Fed. R. Civ. P. 14(a)(1) (emphasis added).

Under the plain language of Rule 14, a third-party claim is proper *only* when the defendant in the main action "is attempting to transfer to the third-party . . . the liability asserted against the defendant by the original plaintiff." *Forum Ins. Co. v. Ranger Ins. Co.*, 711 F. Supp. 909, 915 (N.D. Ill. 1989). "The fact that the third-party claim arose out of the same transaction or set of facts is irrelevant, since impleader cannot be used 'as a way of combining all controversies having a common relationship.'" *Id.*

Because claims for declaratory judgment cannot establish liability of the third-party, the courts have specifically held that actions seeking declaratory judgment are improper under Rule 14. *Id. See also Chicago Dist. Council of Carpenters Pension Fund v. F.H.Paschen/S.N. Nielsen, Inc.*, No. 04 C 1562, 2005 U.S. Dist. LEXIS 6331, at *8-9 (N.D. Ill. Mar. 31, 2005) (third-party complaint against unions seeking declaratory judgment dismissed because unions could not be liable to trust funds or to third-party plaintiff). Count I of the third-party complaint seeks declaratory judgment that Article 4 of the Agreement is invalid and unenforceable. (ATM Compl. at 3.) For this reason, Count I fails to state a claim for which relief can be granted.[2]

### b.    ATM Failed to Exhaust Administrative Remedies

Count II is based on § 301 of the LMRA, 29 U.S.C. § 185, for the Union's alleged breach of the Agreement.[3] (ATM Compl. at 4.) It is well settled that an employer suing under § 301 must

---

[2]ATM has asserted the invalidity of Article 4 as a defense to the Funds' complaint (Answer at 10-11), and the Court can decide that issue without the Union's participation. *See Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 79-83 ,70 L. Ed. 2d 833, 102 S. Ct. 851 (1982) (courts must decide illegality defense raised by employers in actions by trust funds).

[3]The Court can consider the Agreement in deciding the 12(b)(6) motion, although the Agreement was not attached to ATM's complaint, because the Agreement is at the heart of

exhaust administrative remedies available under the grievance procedure of the labor agreement. *Mautz & Oren, Inc. v. Teamsters, Chauffeurs and Helpers Union Local No. 279*, 882 F.2d 1117, 1126-27 (7th Cir. 1989); *Pickens-Kane Moving and Storage Co. v. Int'l Brotherhood of Teamsters, Local Union 705*, No. 98 C 4683, 1999 U.S. Dist. LEXIS 1596, at *12-13 (N.D. Ill. Feb. 9, 1999).[4]

The exhaustion requirement is based on the principle that "the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581 (1960). Exhaustion is also consistent with the "strong policy" favoring settlement of labor disputes by private arbitration and the broad presumption in favor of arbitration. *See Niro v. Fearn Int'l Inc.*, 827 F.2d 173, 176 (7th Cir. 1987).

The presumption favoring arbitration of labor disputes is, in application, a mandate to arbitrate before suing unless the labor agreement cannot be read to permit arbitration. "[T]here is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *Local Union 1393, Int'l Brotherhood of Electrical Workers v. Utilities Dist. of Western Ind. Rural Elec. Membership Cooperative*, 167 F.3d 1181, 1183-84 (7th Cir. 1999) (quoting *AT&T Technologies v. Communication Workers of America*, 475 U.S. 643, 650 (1986)).

If the dispute is substantively arbitrable, employers are excused from exhaustion *only* where

_____

ATM's complaint. *See Cortina v. Hotel & Rest. Emples. Union, Local 1*, No. 06 C 6850, 2008 U.S. Dist. LEXIS 32516, at *4 n.1 (N.D. Ill. March 31, 2008) (collecting cases). The Area Agreement is attached as Exhibit A to the accompanying Statement of Undisputed Facts.

[4]Claims for breach of labor agreements are properly dismissed under Rule 12(b)(6) for failure to exhaust. *See e.g., Douglas v. American Information Technologies Corp.*, 877 F.2d 565, 572-74 (7th Cir. 1989).

the court is compelled to conclude that the grievance procedure completely excludes employer-initiated arbitration and applies only to union or employee-initiated grievances. *Faultless Division v. Local Lodge No. 2040, Machinists*, 513 F.2d 987, 990 (7th Cir. 1975). To excuse an employer from exhaustion, the court must find that the grievance procedure is "completely" or "wholly" union or employee oriented. *United Parcel Service v. Int'l Brotherhood of Teamsters Local 705*, No. 95-C-6304, 1998 U.S. Dist. LEXIS 15905, at *13, 15 (N.D. Ill. Sept. 29, 1998). *See also Mautz & Oren*, 882 F.2d at 1126 n.15; *Standard Brands, Inc. v. Maltsters, Laborers, Syrup, Yeast, Food & Vinegar Workers, Local 121 of the I. B. of T.*, No. 78-C-3651, 1979 U.S. Dist. LEXIS 13348, at *4-5 (N.D. Ill. Mar. 30, 1979).

The Agreement here, read in its entirety, encompasses the dispute and obligates both parties to resolve disputes between them through the arbitration procedures of Article 7. The very first paragraph of the Agreement provides that one of the five main "purposes" of the Agreement is "to adopt suitable measures for the peaceful settlement of grievances and differences" between the parties. (Ex. A ¶ 1.) Article 6 of the Agreement provides that the Union will not strike and the employer will not lockout "[i]n view of the fact that parties have provided for an orderly procedure for settling differences of opinions and disputes . . ." (Ex. A ¶ 6.) Thus, Articles 1 and 6 broadly proclaim that, if there is a dispute between the parties, neither will resort to economic action to resolve the dispute, but will resolve it through the dispute resolution procedure of the Agreement.

Article 7.1 echoes these broad proclamations by providing that "A grievance . . . is a complaint relating to the *application or interpretation of any provision of this agreement* against an employer by an employee; employees or the union and shall be processed in accordance with the following procedure." (Ex. A ¶ 7.1) (emphasis added). Articles 7.2 broadens the scope of matters subject to resolution through the procedure by stating that "disputes," in addition to "grievances,"

not resolvable through a foreman or a superintendent, shall be taken up at a meeting between the "Employer" and "a representative of the Local Union." (Ex. A ¶ 7.2). There is no limitation anywhere in the Agreement concerning the nature of "disputes" that are subject to this provision. If the matter is not resolved at the meeting between the Employer and the representative of the Local Union, it may be reduced to writing and resolved through a "Labor/Management Committee." (Ex. A ¶ 7.3.)

These provisions of the Agreement are certainly broad enough to find that the question of whether the Union violated some obligation to sign-up ATM's subcontractors is substantively arbitrable. There can be no serious question that ATM's claim that the Union violated Article 4.3 by refusing to execute agreements with subcontractors constitutes a "difference" between them and a "dispute" over the application or interpretation of Article 4.3. As such, the question of whether the Union violated Article 4.3 is substantively arbitrable.

While Article 7.1 refers to "grievances" as "complaints" by employees or the Union against the employer, Article 7.1 does not preclude the dispute here from being arbitrated at ATM's initiative. *See Eberle Tanning Co. v. Section 63L, FLM Joint Board, United Food & Commercial Workers*, 682 F.2d 430 (3d Cir. 1982)*; Rental Servs. Corp. USA, Inc. v. Int'l Union of Operating Eng'rs*, No. 99 C 5094, 1999 U.S. Dist. LEXIS 19197, at *10-11 (N.D. Ill Dec. 9, 1999); *Standard Brands*, 1979 U.S. Dist. LEXIS 13348, at *4-5.

Rather, "the question" is whether the arbitration clause itself "allows the employer to pursue arbitration or limits arbitration to those employee-initiated grievances that remain unsettled pursuant to" the previous steps of the procedure. *Rental Servs.*, 1999 U.S. Dist. LEXIS 19197, at *10-11. The arbitration clause here – Article 7.4 – allows ATM to pursue arbitration without limitation.

Article 7.4 provides that, if "the Committee is deadlocked, *the moving party* may submit the

grievance to arbitration for final and binding resolution." (Ex. A ¶ 7.4) (emphasis added). Article 7.4 does not limit the invocation of arbitration of deadlocked grievances to those filed by employees or the Union. Rather, by providing that the "moving party" may submit the grievance to arbitration, Article 7.4 expressly contemplates that *either* the Union or the employer may do so, regardless of the preceding language of Article 7. This conclusion is supported by the Third Circuit's decision in *Eberle Tanning Co. v. Section 63L, FLM Joint Board, United Food & Commercial Workers*, 682 F.2d 430 (3d Cir. 1982), cited approvingly in *Mautz & Oren*, 882 F.2d at 1126 n.15.

In *Eberle*, the employer sued the union for breach of the no-strike clause. 682 F.2d at 431. The union moved to dismiss on exhaustion grounds. *Id*. The employer argued that it was not required to exhaust, because the grievance procedure was only for resolution of employee grievances. *Id*. at 433, 434. The Court rejected the employer's argument.

The agreement in *Eberle* defined a "grievance" broadly as any dispute concerning a violation or the meaning and application of the agreement, but then stated that "an *employee* having a grievance shall report such grievance to his departmental steward who may thereafter discuss the matter with the *employee's* foreman." *Id*. at 432 (emphasis added). The next three steps of the procedure dealt exclusively with the handling of the employee's grievance, and the Court found that the first four steps of the procedure were "employee-oriented." *Id*. at 434. The arbitration clause, however, provided that, "should *the* grievance remain unsettled," then "*either party* may refer it to a three (3) man Board of Arbitration." *Id*. at 432 (emphasis added). The Court held that the language "providing that either party may initiate arbitration of an unsettled *dispute*, creates an ambiguity concerning the Company's duty to arbitrate," which the Court was compelled to resolve in favor arbitration. *Id*. at 434 (emphasis added).

The Court relied on a district court opinion considering a contract, which contained an

"employee-oriented grievance procedure," but which also provided that "'any matter arising from the application of [the] agreement' which could not be settled by the grievance committee would be referred to a Standing Committee and then, on either party's initiative, to arbitration." *Id*. at 435 (citation omitted). The Court agreed with the district court's conclusion that:

> [T]he fact that the section permits either party to submit an issue to final and binding arbitration is a strong indication that the [employer] may be the grieving party, *even though the initial procedures . . . are not suitable for handling the matter*."

*Id*. (emphasis added).

Following this reasoning, the Court in *Eberle* concluded that the employer could initiate grievances "with arbitration" and, therefore, affirmed dismissal of the suit. *Id*. at 436.

The reasoning in *Eberle* applies with equal force here. Because Article 7.4 states that the "moving party" may submit an issue to arbitration, the clause unambiguously provides that either ATM or the Union may advance a matter to arbitration. As in *Eberle*, this language is a strong indication that ATM may be the grieving party, even if there is some question about the suitability of the earlier stages of Article 7 for employer grievances. Otherwise, there would be no purpose in using the term "moving party" in Article 7.4. At minimum, as in *Eberle*, the language in Article 7.4 allowing the "moving party" to submit a grievance to arbitration creates an ambiguity that must be resolved in favor of arbitration. *Compare Rental Servs.*, 1999 U.S. Dist. LEXIS 19197, at *10-11 (the arbitration clause did *not* state which party could invoke arbitration but "unambiguously refer[red] to the employee-initiated grievance[]" not "satisfactorily settled in the preceding steps").

If the parties here intended that only employee or Union grievances could proceed to arbitration, there would have been no purpose in using the term "moving party" in Article 7.4. The parties would have simply said that the Union may submit the deadlocked grievance to arbitration. Indeed, unless the parties contemplated that employer grievances could proceed to arbitration, it

would have been nonsensical for them to use the term "moving party" in Article 7.4, because the employer would *never* be the "moving party" as to employee or Union-initiated grievances.

If the employer could not invoke arbitration for its own grievances, the employer would never be the "moving party" after a deadlocked grievance, because the employer has already effectively "won" a grievance that is deadlocked by the Committee. There is no rational basis for an employer to "move" a deadlocked employee or Union grievance to arbitration, because the employer could do no better in arbitration than a denial of the grievance by the arbitrator, which the employer *already* obtained through the deadlock. The employer could, however, do far worse in arbitration by having an arbitrator sustain the grievance, which the Committee had previously denied. For these reasons, an employer would simply never move a deadlocked employee or Union grievance to arbitration.

In actuality, an employer would only be the "moving party" in arbitration, if the Committee deadlock meant that *the employer* did not get the result it wanted. And, if the deadlock was not the result the employer wanted, the employer must have initiated the grievance. In view of this undeniable reality, the term "moving party" in Article 7.4 reflects an understanding by the contracting parties that the employer will have grievances that it "loses" though a deadlock, which the employer may move to arbitration to in hopes of obtaining a different result.

In short, to give meaning to the term "moving party" in Article 7.4, it must be interpreted to mean that employer grievances may proceed to arbitration. Interpreting Article 7.4 any other way would lead to the absurd result that the employer can be a "moving party" in arbitration, but only for purposes of giving an employee or the Union a second chance on a grievance the employer has already won. As with any contract, a labor agreement should not be interpreted in a way that produces an absurd result. *See Architectural & Ornamental Iron Workers Local Union No. 63 v. Int'l Union of Elevator Constructors, Local 2*, 475 F. Supp. 2d 757 (N.D. Ill. 2006).

Overall, when read as a whole and giving effect to the obvious intent of the parties, the Agreement is reasonably interpreted to require both parties to utilize arbitration to resolve disputes or differences, which include the Union's alleged breach of Article 4.3.  *See Laborers' Pension Fund v. Morack Refractory Constr., Inc.*, No. 91 C 2281, 1993 U.S. Dist. LEXIS 7146, at * 13-14 (N.D. Ill. May 25, 1993) (court must not unduly isolate individual provisions but must construe the collective bargaining agreement as a whole to give effect to the mutual intent of the parties).  To be sure, given the language of Article 7.4, the Court cannot conclude with "positive assurance" that the arbitration clause of Article 7 is not susceptible of an interpretation that it covers the instant dispute. *Eberle*, 682 F.2d at 435.

Having established that the dispute underlying ATM's suit is subject to the arbitration provision, the only question is whether ATM exhausted that procedure.  The third-party complaint does not allege that ATM invoked the grievance procedure, that the Union refused to process or arbitrate its grievance or that ATM was otherwise excused from utilizing the procedure.  Under these circumstances, the Court must conclude that ATM failed to exhaust its administrative remedies.  *See Pickens-Kane*, 1999 U.S. Dist. LEXIS 1596, at *12-13, where the court held that the employer's "failure to allege exhaustion or futility results in failure to state a claim for which relief can be granted."  For the same reason, ATM's § 301 claim in Count II must be dismissed.

## III.   ARGUMENT – RULE 56 MOTION FOR SUMMARY JUDGMENT COUNT II

Summary judgment should be granted if the pleadings together with affidavits show that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A non-moving party can avoid summary judgment only by setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir.

1999). When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Speculation, however, is not the source of a reasonable inference. *See Chmiel v. JC Penney Life Ins. Co.*, 158 F.3d 966, 968 (7th Cir. 1998). The Union is entitled to judgment as a matter of law, because the undisputed facts show that the issues raised by ATM's suit are already in the grievance process and that the Union did not breach the Agreement as alleged.

        **a.**      **The Issues Raised by ATM Suit Are Already Raised by Union Grievances**

Assuming *arguendo* that ATM was not required to exhaust through its own grievance, Count II must still be dismissed because the contractual issues at the heart of ATM's claim will be addressed in grievances filed by the Union.

On February 21, 2008, the Union filed a grievance alleging that ATM was required to post a surety bond, pursuant to Article 10(j) of the Agreement, to cover wage and benefit contributions for which ATM was the "guarantor" under Article 4. (Def. Stat. Facts ¶ 11.) On March 4, the Union filed another grievance alleging that ATM violated Article 4 and requested as part of the remedy that "ATM abide by the current contract including Article 4." (Def. Stat. Facts ¶ 14.)[5] On May 7, the Union filed another grievance seeking information necessary to determine ATM's liability under Article 4 for work performed by subcontractors. (Def. Stat. Facts ¶ 16.)

There is presently a dispute between the parties regarding the status of the February 21 and March 4 grievances, but there is no dispute that the May 7 grievance will be heard by a

---

[5]On March 7, the Union clarified that the March 4 grievance was confined to ATM's obligations under Article 4 to assure that its owner/drivers received "an amount equal to" wages and benefits in the Agreement and to act as a "guarantor" for payments not made by owner/drivers. (Def. Stat. Facts ¶ 15.)

Labor/Management Committee on June 5, 2008.  (Def. Stat. Facts ¶¶ 17, 18.)  ATM can raise the

Union's alleged failure to sign agreements with its subcontractors at that hearing, and there can be

no question that ATM has already made that alleged failure an issue in the grievance process.

On February 26, the Union sent a letter to ATM requesting, in part, that ATM respond to the

Union's "grievances," which at that time included the February 21 grievance and an earlier grievance

alleging violations of Article 4.[6]  (Def. Stat. Facts ¶ 12.)  ATM responded by letter the next day

claiming that ATM had "taken steps that may have been required of its brokers to sign agreements

with Local 330.  However, your office failed to sign them to an agreement."  (Def. Stat. Facts ¶ 13.)

Because ATM has placed the Union's conduct at issue as it relates to the Union's grievances,

the Court should leave the entire matter to the grievance process.  *See A.M. Castle & Co. v. United

Steelworkers of America*, 898 F. Supp. 602 (N.D. Ill. 1995).

In *A.M. Castle*, the agreement contained a clause requiring the employer to establish an

unspecified 401(k) plan.  *Id*. at 604.  When the company refused to implement a plan proposed by

the union, the union filed a grievance alleging that the company violated the agreement.  *Id*. at 605.

 The company then filed suit alleging, in part, that the *union* breached the agreement by refusing to

allow the company to customize the 401(k) plan for its employees.  *Id*. at 613.  The union moved for

summary judgment on exhaustion grounds.  *Id*. at 605.

The court opined that the company might not be required to exhaust, because the arbitration

provision might not permit employer-initiated grievances.  *Id*. at 614.  The Court nevertheless

dismissed the suit because "the issues raised by the company have already been raised by the union

in a grievance and are pending before an arbitrator (or soon will be)."  *Id*.  This approach made

"sense because if the issues the company seeks to resolve in court will be arbitrated anyway, there

---

[6]The Union later withdrew the earlier grievance.  (Def. Stat. Facts ¶ 12.)

is little reason for the court to address them – especially when the arbitrator's decision may be binding upon the court." *Id*. The same rationale applies here.

It is clear that a Committee or arbitrator considering the Union's grievances will be confronted with the same issues raised by ATM here. In all three grievances, the Union claims that ATM is liable in some fashion for payments the subcontractors did not make. ATM has expressly made the Union's alleged failure to sign agreements with subcontractors an issue in the grievance process. Thus, to decide the grievances, the Committee or an arbitrator must decide whether the Union failed to sign appropriate agreements with the subcontractors and, if so, whether that failure could relieve ATM of liability (or require the Union to bear some responsibility for that liability). Those are precisely the issues presented to the Court in Count II. (ATM Compl. at 4 ¶ 9.)

Thus, as in *A.M. Castle*, dismissing Count II makes sense, because the issues ATM seeks to resolve here will be arbitrated anyway, there is no reason for the Court to address them separately, especially where doing so could result in conflicting decisions.

**b.     The Union Did Not Refuse to Sign Agreements with Subcontractors as Required by the Agreement**

Count II of the third-party complaint should be dismissed because the undisputed material facts show, quite simply, that the Union did not breach the Agreement as alleged by ATM.

ATM alleges that "ATM required its owner/drivers and/or subcontractors to sign an agreement with the Union as set forth in the Area Wide Material Hauling Agreement but the Union refused and/or failed to sign ATM's owner/drivers and/or subcontractors." (ATM Compl. at 4.) ATM claims that the Union's refusal constitutes a breach of the Agreement, and that this breach makes the Union liable to ATM for ATM's liability to the Funds. (ATM Compl. at 4 ¶ 11.) For the reasons that follow, ATM cannot succeed with this claim.

Article 4.3 of the Agreement provides:

> The subcontract shall further require the subcontractor to sign an agreement with the Union requiring the subcontractor to make payments *to the health and welfare fund and the pension fund, referred to in Articles 10 and 11 of this Agreement.* Such payments shall be made only for work performed on the particular project by the subcontractors employees. Such *payments shall be made to the same trusts*, in the same amounts and upon the same terms and conditions of the contractor under this Agreement. The contractor shall be a guarantor for such payments.

(Def. Stat. Facts ¶ 10, Ex. A at 5-6.) (emphasis added).

Article 38 of the Agreement provides that "owner operators" may choose to not to participate in the Funds, but then must then "contribute the equivalent amount of current contribution rates/monies *to the Teamsters National 401(k) Savings Plan*." (Def. Stat. Facts ¶ 10, Ex. A at 33.) (emphasis added).

Based on the language of Articles 4.3 and 38, if the Union had any obligation to sign agreements with subcontractors, its *sole* obligation would be to sign agreements that obligate subcontractors to make payments *to the trust funds* established by Articles 10 and 11 or to make equivalent payments *to the Teamsters National 401(k) Savings Plan.*[7]  In other words, the Union could only breach the Agreement by failing or refusing to sign an agreement with a subcontractor, who in turn agreed to sign an agreement obligating it to make payments *to the trust funds* or *to Teamsters National 401(k) Savings Plan.*  Nowhere does ATM allege that the Union refused to sign such an agreement and, as a matter of fact, the Union never did.

Dominic Romanazzi has been the president and principal officer of the Union since January 1, 2004, which covers the period of time that the Agreement (and Article 4.3) has been in effect. (Def. Stat. Facts ¶ 5.) Romanazzi is the only official with the authority to sign agreements on behalf

---

[7]The Union does not concede it is required to sign agreements with anyone.

of the Union. (Def. Stat. Facts ¶¶ 6, 7.) While employers and subcontractors may negotiate with, request agreements from or propose agreements to other Union agents, Romanazzi must review, approve and *sign* all such agreements on behalf of the Union. (Def. Stat. Facts ¶ 8.) Since Romanazzi took office, every agreement between any entity and the Union has been signed by Romanazzi on behalf of the Union. (Def. Stat. Facts ¶ 9.)

At no time has Romanazzi ever failed or refused to sign an agreement with *any* person or entity that requested, proposed or otherwise indicated any desire or willingness to sign an agreement that would obligate them to make payments to the trust funds established by Articles 10 and 11 of the Agreement or the equivalent of such contributions to the Teamsters National 401(k) Savings Plan. (Def. Stat. Facts ¶ 20.)

Applying Articles 4.3 and 38 to these undisputed facts, the Union is entitled to judgment as a matter of law. Because the Union could *only* have breached the Agreement by refusing to sign agreements with subcontractors who agreed to make contributions to the trust funds or equivalent contributions to the Teamsters 401(k) plan, and because the Union never refused to sign such an agreement, there is no breach. Thus, for this separate and independent reason, Count II of the third-party complaint should be dismissed.

## IV.    CONCLUSION

The Union respectfully requests that the Court grant the Rule 12(b)(6) motion and dismiss the third-party complaint or, in the alternative, grant the Rule 56 motion for summary judgment.

Respectfully submitted,
 /s/ Robert S. Cervone
Robert S. Cervone

Robert S. Cervone
Dowd, Bloch & Bennett
8 South Michigan Avenue - 19th Floor
Chicago, IL 60603 - (312) 372-1361