Case 1:08-cv-01074    Document 37-2    Filed 07/11/2008    Page 1 of 13

Page 4

2005 U.S. Dist. LEXIS 42046, *; 38 Employee Benefits Cas. (BNA) 1120

29 U.S.C. § 1145.

Moreover, § 515 enables plans to seek tardy contributions under an agreement "even though there was no collective bargaining agreement under § 301 of the LMRA." *Laborers' Pension Fund v. Joe Cachey Construction Company, Inc.* 947 F.Supp. 365, 373 (N.D. Ill. 1996). [*13] The broad enforcement powers authorized by § 515 enable plans to enforce labor agreements according to their terms "without regard to understandings or defenses applicable to the original parties [the employer and the union]." *Laborers' Pension Fund v. A&C Environmental, Inc.*, 301 F.3d 768, 778 (7th Cir. 2002) (*quoting Gerber Truck*, 870 F.2d at 1149). Thus, § 515 forecloses contract defenses to the validity of an agreement such as "fraud in the inducement, oral side agreement, course of performance, want of consideration, [and] failure of the union to have majority support" in ERISA suits. *Gerber Truck*, 870 F.2d at 1154.

For example, in *Gerber Truck*, Gerber and a union representative agreed that Gerber would sign a "participation agreement" that obligated Gerber to make pension and welfare contributions to all truck drivers represented by the union, but further orally agreed that the obligation would not be enforced except for with respect to three employees. In concluding that Gerber was required to contribute to the pension and welfare funds despite an oral agreement to the contrary, the Seventh [*14] Circuit noted that "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement." *Gerber Truck*, 870 F.2d at 1153. Rather, the court found that the "written agreement" language in § 302(c)(5)(B) of the LMRA did not limit the LMRA's scope only to "formal collective bargaining agreement[s]." *Gerber Truck*, 870 F.2d at 1154. The court further found that, "section 302(c)(5)(B) [of the LMRA], like § 515 [of ERISA], prevents a court from giving force to oral understandings between union and employer that contradict the writings." *Gerber Truck*, 870 F.2d at 1154. In so holding, the court recognized that "the upshot may be harsh" because Gerber could be held accountable even though he believed that the union representative could be kept to his pledge when Gerber signed the participation agreement. *Gerber Truck*, 870 F.2d at 1155. Nevertheless, the pension fund was entitled to enforce even this "sham" agreement between the union and Gerber. *Gerber Truck*, 870 F.2d at 1155.

*Gerber Truck* is on point with this [*15] case. Here, Reeves signed an agreement that, on its face, stated that (1) the Laborers were a party to the agreement, (2) wages would be established and negotiated in party by the Laborers, and (3) fringe benefits would be in conjunction

with the Laborers' CBA. While the fencing addendums are not CBAs in the traditional sense, do not designate the Laborers as the exclusive bargaining unit, do not specify methods of resolving disputes, and do not require all employees to become members of the Laborers, the absence of these terms does not mean that the addendums are not enforceable pre-hire agreements under the LMRA or ERISA. *See Gerber Truck*, 870 F.2d at 1154. The fact that Reeves did not sign a separate CBA with the Laborers is equally irrelevant. *Gerber Truck*, 870 F.2d at 1154. Accordingly, the court finds that the agreement was valid under the LMRA and enforceable under ERISA.

Reeves once again makes too much of the cases on which it relies to argue that a recognition clause is essential to a valid pre-hire agreement under § 301. *See* [*16] *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. ("Associated Builders II")*, 507 U.S. 218, 230, 113 S.Ct. 1190, 1197, 122 L.Ed.2d 565 (1993); *Martin v. Garman Construction Company*, 945 F.2d 1000, 1001 (7th Cir. 1991); *Oil, Chemical & Atomic Workers v. Union Tank Car*, 475 F.2d 194, 199 (7th Cir. 1973). Reeves asserts that the Supreme Court has "unambiguously defined a valid, enforceable § 8(f) pre-hire agreement as a 'collective bargaining agreement. . . .'" in *Associated Builders II*, 507 U.S. at 230, 113 S.Ct. at 1197. *See* Reply Brief, pp. 2-3. First, the court notes that Reeves assumes *Associated Builders II* refers to a CBA only in its classic sense, preenactment of § 8(f). Regardless, a careful reading of this case and the cases on which it relies shows that the language in *Associated Builders II* is descriptive, rather than proscriptive. *See Jim McNeff, Inc., v. Todd*, 461 U.S. 260, 266, 269-70, 103 S. Ct. 1753, 1756, 1758, 75 L. Ed. 2d 830 (1983)(referring to a pre-hire agreement as merely "a contract" or "an agreement" and rejecting the view that a pre-hire [*17] agreement makes the union the exclusive bargaining agent); *Associated Builders and Contractors of Massachusetts/Rhode Island, Inc. v. the Massachusetts Water Resources Authority ("Associated Builders I")*, 935 F.2d 345, 356 (1st Cir. 1991) (noting that union status is immaterial in a pre-hire agreement), *judgment reversed in Associated Builders II*, 507 U.S. 218, 113 S. Ct. 1190, 122 L. Ed. 2d 565. *Martin* does nothing more than reference a pre-hire agreement. *See* 945 F.2d at 1001. Finally, Reeves' reliance on a single statement in *Union Tank* that "contractual rights cannot exist separately and apart from the union's right to represent the union" takes that case out of context. *See* 475 F.2d at 199. The *Union Tank* court did not address the validity of a CBA, but rather the effect of a separate, contrary agreement between the union and the employer. *See* 475 F.2d at 196-97. This issue simply does not implicate the circumstances here. Reeves' argument misun-

Case 1:08-cv-01074    Document 37-2    Filed 07/11/2008    Page 2 of 13

Page 5

2005 U.S. Dist. LEXIS 42046, *; 38 Employee Benefits Cas. (BNA) 1120

derstands the nature of a pre-hire agreement as, itself, an enforceable agreement creating the very contractual rights that Reeves argues must preexist.

[*18] Next, Reeves argues that a lack of mutual assent defeats enforcement of the fencing addendums. A lack of mutual assent is not an available defense to a pension fund's suit for contributions under ERISA. *Gerber Truck*, 870 F.2d at 1154. However, Reeves argues that the fund's "LMRA claim" is distinct from its "ERISA claim," and that a lack of mutual assent may be asserted as a defense to the LMRA claim.

It is true that defenses that are not available in ERISA suits may remain viable for claims brought under the LMRA in certain circumstances. *See, e.g., A&C Environmental*, 301 F.3d at 774 n.3 ("Our decision today does not hold that the protection against certain defenses that ERISA provides in claims by funds for delinquent fund contributions applies as well to claims by funds for union dues.") This case is not one of those situations. When a pension fund third-party beneficiary, rather than an original party to the contract (such as the union), brings suit to collect delinquent contributions, the LMRA does not create claims and defenses separate from the parties' rights and obligations under ERISA. *See Giardono v. Jones*, 867 F.2d 409, 416 (7th Cir. 1998) [*19] (Easterbrook, J., concurring) ("The local union's willingness to wink at noncompliance with the collective bargaining agreement does not excuse Jones's disregard of his independent obligation to the trust."), *abrogated on other grounds in Yates v. Hendon*, 541 U.S. 1, 124 S.Ct. 1330, 158 L.Ed.2d 40 (2004); *Operating Engineers Pension Trust v. Cecil Backhoe Service, Inc.*, 795 F.2d 1501, 1507 (9th Cir. 1986); *Central States, Southeast and Southwest Areas Pension Fund v. Kabbes Trucking Company*, 2004 U.S. Dist. LEXIS 23558, No. 02 C 1809, 2004 WL 2644515, at *16-17 (N.D. Ill. 2004)(collecting cases). On a practical level, drawing a distinction between a fund's claim under the LMRA and ERISA makes no sense. A fund already is entitled to enforce an agreement regardless of whether there was a lack of mutual assent between the union and employer, or any other problem in the formation of the agreement, with limited exceptions not argued here. *See A&C Environmental*, 301 F.3d at 780; *Iron Workers' Local No. 25 Pension Fund v. Nyeholt Steel, Inc.*, 976 F. Supp. 683, 689 n.10 (E.D. Mich. 1997).

Reeves cannot rely [*20] on *Caporale v. Mar Les, Inc.* 656 F.2d 242 (7th Cir. 1981). Although factually similar to this case, *Carporale* was decided prior to the recognition of pre-hire agreements as independently enforceable collective bargaining agreements. *See J.W. Peters, Inc.* 398 F.3d at 973. In addition, *Carporale was* decided only under the LMRA without reference to § 515 of ERISA, which had not yet been enacted when *Carporale* was argued and certainly was not in force during the period at issue in that case. *See* 29 U.S.C. § 1145. Both the Seventh Circuit and numerous district courts in this Circuit since have rejected *Carporale's* application to a fund's petition for delinquent funds, as the legal underpinnings of *Carporale* no longer are sound on facts such as these. *See Kabbes Trucking*, 2004 U.S. Dist. LEXIS 23558, 2004 WL 2644515, at *16-17.

Finally, Reeves' argument that the fencing addendums fail to establish an express promise or create an obligation to make contributions must be rejected. Reeves isolates a portion of one sentence in the addendums that states "all fringe benefits [*21] will be in conjunction with the Ironworkers and Laborers' respective Building Collective Bargaining Agreements," and argues that it does not establish an obligation with clarity. Viewed in their entirety, however, the fencing addendums demonstrate no ambiguity regarding the status of the Laborers as a party to the agreements and Reeves' obligation to conform to the separate Ironworkers and Laborers' CBAs, including the fringe benefits provisions of those CBAs that were specifically mentioned in each fencing addendum. Consequently, Reeves' assertion that he believed the fencing addendums created a relationship only with the Ironworkers is merely a statement of subjective understanding, contradicted by unambiguous terms contained in the contract. *See, e.g., A&C Environmental*, 301 F.3d at 781 (noting that if the defendant had simply reviewed the agreement, he would have observed that it required him to contribute to the pension funds). In any event, Reeves fails to explain how he could fail to comprehend his obligation to the Laborers' funds while understanding his obligation to the Iron Workers' funds, when the addendums refer to both obligations in the same breath.

[*22] For the foregoing reasons, the Motion for Summary Judgment filed by the defendant, Reeves Fence Company, Inc., on December 2, 2005 is **DENIED**.

ENTERED this 26th day of May, 2005

s/ ANDREW P. RODOVICH

United States Magistrate Judge

18 of 22 DOCUMENTS

**CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND,
CHICAGO DISTRICT COUNCIL OF CARPENTERS WELFARE FUND, and the
CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF
CARPENTERS APPRENTICE AND TRAINEE PROGRAM, Plaintiffs, v.
SKENDER CONSTRUCTION COMPANY, INC., Defendant. SKENDER
CONSTRUCTION COMPANY, INC., Defendant/Third-Party Plaintiff, v.
CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF
CARPENTERS, AFL-CIO, ERNEST O'NEAL, individually and d/b/a MIDWEST
FLOORING a/k/a MIDWEST FLOORING INSTALLATION, INC., and
MIDWEST FLOORING a/k/a MIDWEST FLOORING INSTALLATION, INC.,
Third-Party Defendants.**

97 C 2455

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**1997 U.S. Dist. LEXIS 16860**

**October 23, 1997, Decided
October 27, 1997, Docketed**

**DISPOSITION:**    [*1]  Third-party defendant's motion to dismiss granted.

**COUNSEL:** For CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, CHICAGO DISTRICT COUNCIL OF CARPENTERS WELFARE FUND, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE AND TRAINEE PROGRAM, plaintiffs: Brian Todd Garelli, Kevin Patrick McJessy, Lord, Bissell & Brook, Chicago, IL.

For SKENDER CONSTRUCTION COMPANY, INC., defendant: Patricia Mary Fennell, Joseph Patrick Berglund, Stanley E. Niew, Kathleen I. Niew, Niew & Associates, P.C., Oakbrook, IL.

For SKENDER CONSTRUCTION COMPANY, INC., third-party plaintiff: Patricia Mary Fennell, Joseph Patrick Berglund, Stanley E. Niew, Kathleen I. Niew, Niew & Associates, P.C., Oakbrook, IL.

**JUDGES:** George W. Lindberg, United States District Judge.

**OPINION BY:** George W. Lindberg

**OPINION**

MEMORANDUM OPINION AND ORDER

The Chicago District Council of Carpenters Pension and Welfare Funds and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program (Trust Funds) brought this action pursuant to § 502 of the Employment Retirement Income Security Act (ERISA) and § 301 of the Taft-Hartley Act. Plaintiffs allege that defendant, Skender Construction [*2] Co., a signatory to a collective bargaining agreement (the area agreement) with the Chicago and Northeast Illinois District Council of Carpenters (Union), failed to make required contributions to the Trust Funds. According to the terms of the area agreement, Skender Construction is required to assume the obligation to pay fringe benefits to the Trust Funds for the carpenter employees of its subcontractors when their work is performed pursuant to a contract with Skender Construction. The Trust Funds allege that Skender Construction subcontracted work that fell within this provision of the area agreements to Midwest Flooring Installation, Inc. Because Midwest Flooring did not make contributions to the Trust Funds for the hours worked by its carpenters and had also not secured a wage and benefit bond as required by the area agreement, the Trust Funds assert that Skender is now liable to it for those contributions.

1997 U.S. Dist. LEXIS 16860, *

Skender Construction in turn brought a third-party complaint against Midwest Flooring and the Union, seeking indemnification for its liability. In its count against the Union, Skender alleges that the Union breached the "most favored nations" clause of the area agreement with [*3] Skender by "allowing Midwest Flooring to employ carpenters without posting a bond." The Union has filed a 12(b)(6) motion, making several points in support of dismissal. First, it asserts that it has no duty to secure a bond for signatory employers such as Midwest Flooring and that Skender bore the responsibility of asking the Union to certify that Midwest Flooring had indeed secured a proper bond. Because Skender did not do so, the Union claims, Skender cannot now blame the Union for its omission. The Union states that without a request for certification from Skender, it had no duty to notify Skender Construction that Midwest Flooring was not bonded. In addition, the Union points to the arbitration provision in the area agreement, stating that this matter is subject to arbitration.

In response, Skender argues that the Union relies on documents outside the complaint to support its arguments, which it claims is inappropriate in a motion to dismiss. The court may consider documents incorporated by reference in the pleadings. United States v. Wood, 925 F.2d 1580, 1582 (7th Cir. 1991). Skender has relied on the terms of the contract itself in the complaint to establish the Union's [*4] liability and the Union may do the same to refute these arguments. Skender also asserts that it is premature to make arguments concerning arbitration in a motion to dismiss although it cites no case law to support this argument. A court's refusal to entertain a party's motion to enforce such a provision lessens its usefulness and defeats the parties' original agreement as to a forum for disputes. Should it be clear at this stage that the parties must arbitrate this matter, there is no reason to continue discovery and extend the litigation. See, eq., Central States, Southeast and Southwest Areas Pension Fund v. Reebie Storage & Moving Co., 1991 WL 105503 (N.D.Ill.) (denying motion for reconsideration of court's dismissal of case pursuant to arbitration clause); Central States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc., 1991 WL 18412 (N.D.Ill.), vacated on other grounds. As is clear from the briefing that has already occurred in this case, delaying a decision on whether this action falls under the agreement's arbitration clause would merely waste the court's and the parties' resources. [1]

1  Although the parties agree that only approximately $ 6,600 is at stake in this matter, they have fully briefed--including a motion to file a surreply and the surreply itself--the instant motion to dismiss. The plaintiffs and defendant/third-party plaintiff have also briefed and

argued a motion for a protective order and have begun deposing witnesses. As Judge Shadur pointed out in another ERISA pension fund case, "the court is constrained to observe that the resources obviously expended here by (the parties) would have been far better devoted to an early (and necessarily less costly overall) settlement." Central States, Southeast and Southwest Areas Pension Fund v. Reebie Storage & Moving Co., 815 F. Supp. 1131, 1132 (N.D.Ill. 1993).

[*5]  As to the substance of the motion, Skender Construction asserts that it is not claiming that the Union has a duty to secure a bond for signatories. Instead, Skender claims that the Union violated the "most favored nations" clause of the agreement by allowing Midwest Flooring to operate without a bond. Skender claims that the Union breached its duty not to subject Skender to more unfavorable contract terms or work rules than other signatories enjoy. In short, Skender is claiming that Midwest Flooring got better contract terms because it did not post a bond as it was required to do under the area agreement. Further, Skender claims that this breach makes the Union liable to it for the shortfall in contributions to the Trust Funds.

In response to the Union's claim that Skender's cause of action is subject to arbitration, Skender states that the arbitration clause in the agreement only provides for arbitration of disputes involving the "interpretation" of the agreement and that its claim "arises from the Union's failure to enforce the 'most favored nations' clause equally among signatory employers."

As is clear from this statement, Skender does not assert--nor did it state in the complaint--that [*6]  the Union signed an agreement with Midwest Flooring that on its face does not require Midwest Flooring to post a bond. It also does not assert that the Union intentionally allowed Midwest Flooring to operate without posting a bond. Therefore, the claim that the Union granted Midwest Flooring better terms by "allowing it to operate without a bond" is more clearly cast as one that the Union has a duty to enforce each provision and to monitor each signatory to ensure that it is complying with the terms of the agreement.

There is no need for the court to decide whether the Union has such a duty under the area agreement as this would clearly require it to interpret the meaning and application of the "most favored nations" clause. Whether the Union must enforce all signatories' compliance with the terms of the agreement--in addition to merely subjecting all signatories to the same terms and conditions--is certainly not clear from the face of the contract or the "most favored nations" clause. More important, the clause enabling signatories to receive Union certification

1997 U.S. Dist. LEXIS 16860, *

that another signatory is bonded indicates that it may very well be the responsibility of the general contractor to monitor [*7] compliance with the agreement's terms. Therefore, this dispute requires interpretation of the terms of the agreement and falls under the agreement's arbitration clause. Dismissal is appropriate on that basis.

ORDERED: Third-party defendant's motion to dismiss is granted.

ENTER:

George W. Lindberg

United States District Judge

DATED: OCT 23 1997

4 of 22 DOCUMENTS

**TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS WELFARE AND PENSION FUNDS, Plaintiffs, v. HOPE CARTAGE, INC., an Illinois Corporation, Defendant.**

**No. 02 C 8775**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2005 U.S. Dist. LEXIS 27866; 178 L.R.R.M. 2513; 151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747**

**November 15, 2005, Decided**
**November 15, 2005, Filed**

**COUNSEL:** [*1] For Trustees of the Suburban Teamsters of Northern Illinois Welfare and Pension Funds, Plaintiff: John Joseph Toomey, Steven F. McDowell, Arnold & Kadjan, Chicago, IL.

For Hope Cartage, Inc. an Illinois corporation, Defendant: Joseph Patrick Berglund, Berglund & Niew PC, Oakbrook, IL.

For Hope Cartage, Inc., ThirdParty Plaintiff: Joseph Patrick Berglund, Berglund & Niew PC, Oakbrook, IL.

For Union Local 179 affiliated with the International Brotherhood of Teamsters, General Chauffeurs, Sales Drivers, and Helpers, Robert White an individual, Third Party Defendants: Joseph Patrick Berglund, Berglund & Niew PC, Oakbrook, IL; Roger N. Gold, Roger N. Gold, Ltd., Chicago, IL.

**JUDGES:** Judge James B. Zagel.

**OPINION BY:** James B. Zagel

**OPINION**

**MEMORANDUM OPINION AND ORDER**

In March 1989, John Sinese, owner of Hope Cartage, Inc. ("Hope"), signed a collective bargaining agreement (CBA) on behalf of Hope with Teamsters Local 179 ("Union"). Sinese thereafter extended the CBA four times, through April 2005. Plaintiffs are the Trustees of the Suburban Teamsters of Northern Illinois Welfare and Pension Funds (the "Funds"). Plaintiffs first learned of the Hope-Union CBA in October 2001, shortly [*2] af-

ter Hope renewed the CBA and a Union employee sent the Funds a "new employer" package.

In November 2001, Plaintiffs contacted Hope and demanded reports and contributions for the months of May 2000 through September 2001. The following year, Plaintiffs' payroll auditor declared that Hope owed Plaintiffs' Welfare Fund $ 23,412.02 and Plaintiffs' Pension Fund $ 15,904.45 on behalf of Hope's owner and employee Sinese. When Hope failed to pay, Plaintiffs filed suit seeking an audit and contributions dating back to 1992. That audit revealed allegedly delinquent payments for Sinese and owner-drivers to whom Hope subcontracted work. With interest and other penalties permitted under 29 U.S.C. § 1132(g)(2), the alleged delinquency presently totals $ 226,092.16.

Both parties filed cross motions for summary judgment, seeking resolution of the case without resort to trial. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A [*3] genuine issue of material fact exists when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the nonmovant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Plaintiffs argue that they are entitled to the full amount of the delinquency for the following reasons: Sinese signed a CBA, which requires contributions to the

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

Funds; Sinese is a dual status owner/employee for whom Hope must make contributions pursuant to *Yates v. Hendon,* 541 U.S. 1, 124 S. Ct. 1330, 158 L. Ed. 2d 40 (2004); Hope has no valid defense to non-payment of the contributions for Sinese; and Hope is required under the terms of the bargaining agreement to make contributions on behalf of non-union owner-drivers to whom Hope subcontracted work. Hope disputes that any monies are owed under the CBA. It first argues that Plaintiffs cannot seek contributions for the owner of a one-man corporation, notwithstanding the holding in *Yates.* Hope also [*4] maintains that it is not responsible for any contributions on behalf of Sinese because Sinese and the Union agreed that Hope would not be required to make contributions to the Funds and because Sinese subsequently waived his rights to any benefits from Plaintiffs. In the alternative, Hope argues that Plaintiffs cannot seek contributions for the period prior to 2001, when Plaintiffs first learned of Hope's CBA with the Union. Finally, Hope argues that any demand for contributions for owner-drivers hired as independent contractors is illegal under Seventh Circuit precedent and conflicts with the express language of the CBA.

### Sinese's Status as the Sole Owner-Employee

The Agreements and Declarations of Trust ("Trust Agreements") establishing the Funds are incorporated by reference into the CBA signed by Hope and the Union. The CBA requires weekly pension and welfare contributions to the Funds for all employees covered by the agreement. The Trust Agreements define an employer as any association, individual, partnership or corporation that has a collective bargaining agreement with the union and defines an employee as any person employed by an employer. There is no written [*5] side agreement between the Union and Hope regarding the payment of welfare or pension benefits. It is undisputed that Hope never made any contributions for John Sinese, who drives a truck for Hope to haul sand, gravel and other materials and who is Hope's 100% owner.

In *Yates,* the Supreme Court held that the sole shareholder and president of a corporation, in his capacity as a working owner, is a participating employee in an ERISA pension plan as long as the plan covers one or more employees other than the owner and his spouse. 541 U.S. at 20-22. That decision abrogated this Circuit's decision in *Giardono v. Jones,* 867 F.2d 409, 412 (7th Cir. 1989) and similar holdings in four other Circuits. *Yates* recognized that under ERISA, a working owner may have dual status as an owner and as an employee entitled to participate in a pension plan. *Id.* at 16 ("a working owner can wear two hats, as an employer and employee"). Plaintiffs allege that Sinese, the sole shareholder and president of Hope, is analogous to the defendant-owner in *Yates.* Plaintiffs argue that *Yates* is binding upon Hope because

the relevant ERISA plan covers more than 650 [*6] contributing employers and 5,500 participating employees - far more than the "one or more employees" other than the owner and his or her spouse required by *Yates. Id.* at 6.

Hope seeks to distinguish Sinese from the defendant in *Yates* by relying on its status as a "one man corporation." (Def. Mem. at 13.) In the Seventh Circuit, a one-person corporation "must use a Keogh plan rather than an ERISA plan for its solitary employee." *In re Baker,* 114 F.3d 636, 639 (7th Cir. 1997). As the *Yates* decision did not address owners who were also the corporation's sole employee, Hope argues that *Yates* applies only to owners of companies employing other individuals. Hope contends that *Baker* is still good law post- *Yates,* and that owners of corporations employing only the owner cannot be required to contribute to traditional pension plans but must establish Keogh plans instead.

*Yates* arose from a bankruptcy proceeding against a debtor's pension plan. 541 U.S. at 7-9. The bankruptcy trustee sought to recover funds paid into the pension plan by the debtor, who was the president and sole shareholder of the corporation. *Id.* The trustee argued [*7] that under ERISA, the debtor could not participate in the plan and that the money should be turned over to creditors. *Id.* The court rejected this argument and classified the debtor as an eligible participant in the ERISA plan, thereby allowing him to retain his pension. *Id.* at 16.

The pension plan at issue in *Yates* was not a multi-employer plan like the one in the instant case, but one in which the "one or more" other employees contemplated by the Court's ruling were actually employed by the business owner. Plaintiffs place little weight on this factual difference, and with good cause. Sinese, on behalf of Cartage, freely entered into a CBA with the Union that required contribution to ERISA-governed funds. Notwithstanding Sinese's right to establish a Keogh plan as indicated by *Baker,* he signed a contract on behalf of his corporation agreeing to participate in an ERISA-governed plan. *Yates* clearly establishes that Sinese's status as the company's owner and sole shareholder does not prohibit his participation in that plan. [1] I find that Sinese's status as both the owner and sole employee of Hope is not a defense to the Funds' pursuit of contributions. [*8] [2]

---

[1]   In *Yates,* the Supreme Court observed that "plans that cover only sole owners or partners and their spouses, the [department of labor's] regulation instructs, fall outside Title I's [of ERISA] domain." 541 U.S. at 21. However, the plan at issue in this litigation covers hundreds of employers and thousands of employees; it is not outside of Title I's scope.

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

2  *Cf. Moriarty v. Korkis*, No. 02 C 2861, 2004 U.S. Dist. LEXIS 19671, at *4 (N.D. Ill. Sept. 30, 2004) (noting that after the *Yates* ruling, the defendant withdrew his argument that president and sole shareholder of the corporation could not participate in an ERISA plan).

### Sinese's Alleged Waiver of Participation in the Funds

Sinese entered into the CBA in order to secure contracts available only to union employers. It is also uncontested that Sinese was Hope's sole driver during the period in dispute (setting aside, for the moment, the issue of the subcontractors Hope hired for its overflow [*9] work). Sinese alleges that when he signed the CBA he simultaneously entered into an oral agreement with Union representative Robert White. According to Sinese, the oral agreement permitted Hope to avoid any contribution to the Funds. Hope seeks summary judgment of Plaintiffs' claim for contributions on the grounds that Sinese knowingly and voluntarily waived all benefits Plaintiffs may have provided to him under the trust agreements. Hope argues that it cannot be liable for contributions if Sinese waived Hope's obligation to pay and his own right to receive any benefits in return.

Relying on cases establishing that employees are entitled to waive their participation in ERISA plans, Hope argues that Sinese was entitled to waive his participation in the Funds so long as the waiver was knowing and voluntary. *See, e.g., Sharkey v. Ultramar Energy*, 70 F.3d 226, 231 (2d Cir. 1995) (observing that individuals may waive their right to participate in pension benefit plans when, "in the totality of the circumstances, the individual's waiver of his right can be characterized as 'knowing and voluntary'") (quoting *Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir. 1991)). [*10]

Plaintiffs argue that whether or not Sinese and the Union verbally agreed that Hope would not be required to make contributions to the Funds (a fact the Funds and Robert White vehemently deny), they are not bound by any such agreement. *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1149 n.1 (7th Cir. 1989) (en banc) (citations omitted) established that bargaining history is "irrelevant" and the discovery of such information is unavailable when fund trustees seek to enforce the terms of a collective bargaining agreement. Funds are entitled to enforce collective bargaining agreements according to their terms and without regard to the understandings or defenses applicable to the original parties to the agreement. *Id.* at 1149. These defenses include fraud and oral side agreements. *Id.* at 1154. *See also Central States, Southeast & Southwest Areas Pension Fund v. Joe*

*McClelland, Inc.*, 23 F.3d 1256, 1257-58 (7th Cir. 1994) ("no matter what an employer and local union agree orally, the collective bargaining and contribution agreements establish the employer's obligation [*11] to the pension fund, which is not party to local understandings and limitations . . . as a matter of law the [local] understanding is irrelevant").

The *Gerber* Court, however, based its decision on the premise that the plaintiff funds relied on the terms of the written agreement. *Id.* at 1151 ("plans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits"). In this case, Plaintiffs did not have notice of the written agreement between Hope and the Union until 11 years after its formation, and Hope's employee[s] did not figure into Plaintiffs actuarial computations prior to October 2001. Hope claims that to award any contributions to Plaintiffs for the period prior to October 2001 would provide Plaintiffs with a pure windfall, free of any corresponding obligation to provide benefits to Sinese. (Def. Mem. in Opposition, at 7-8.)

Nonetheless, there is a persuasive argument for holding Hope (and the Union) to the terms of the written contract. "*Gerber* does not indicate that the pension fund must be 'hurt' to recoup contributions under its collective bargaining agreement. Rather, *Gerber* emphasizes [*12] the national policy of requiring employers to fulfill their pension agreements, which in turn, minimizes administrative problems, litigation costs, and adverse selection." *Central States, Southeast and Southwest Areas Pension Fund v. Tank Transport, Inc.*, 1993 U.S. Dist. LEXIS 13044, No. 90 C 5524, 1993 WL 369331, at *8 (N.D. Ill. Sept. 17, 1993) (citation omitted). The facts surrounding Sinese's alleged oral agreement to avoid contributions to the funds are disputed. [3] What is not disputed is the fact that Sinese and the Union signed a CBA requiring Hope to contribute to the Health and Welfare Funds on behalf of each regular employee covered by the agreement and to contribute to the Pension fund for each regular employee who worked two calendar days in any calendar week. Sinese admits that he was never told, by Plaintiffs, that contributions were not required. That the Union failed to forward a copy of the CBA to Plaintiffs prior to October 2001 does not alter the overriding principle that employers have an obligation to fulfill the promises they make in collective bargaining agreements. While Hope may assert other defenses to Plaintiffs' effort to collect contributions for the entire statutory [*13] period, Sinese's purported oral agreement waiving his obligation to make contributions carries no weight. [4] To hold otherwise would ignore the plain language of the CBA.

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

3   Robert White denies agreeing to any scheme in which Hope would not be required to make all of the contributions required by the CBA.

4   I also find unpersuasive Hope's defense to collection of contributions based on Sinese's 2005 effort to waive unilaterally his entitlement to any benefits from Plaintiffs. In support of this defense, Hope again relies on cases establishing the right of individuals to waive their entitlement to participate in single-employer pension plans. *See, e.g., Laniok v. Advisory Committee of Brainerd Mfg. Co. Pension Plan,* 935 F.2d 1360 (2d Cir. 1991). Those cases were brought under 29 U.S.C. § 1132(a)(1)(B) by plaintiffs asserting claims for benefits; the defendants argued that the claims were barred by bargained-for releases (waivers) made knowingly and voluntarily. *See id.* In the instant case, an employer is attempting to avoid an action filed by the Plans under 29 U.S.C. § 1145 on the basis of the owner-employee's post-facto, unilateral offer to amend the terms of the CBA. The cases cited by Hope do not bear upon the outcome of this dispute. Hope's argument that Sinese was entitled to waive unilaterally any obligation to or entitlement from Plaintiffs (eleven years after signing the CBA) because the trust documents do not explicitly forbid waivers is similarly unavailing.

[*14] *Plaintiffs' Right to Contributions Falling within the Statute of Limitations Period*

Finally, Hope seeks to avoid contributions for the period preceding October 2001, when Plaintiffs learned of the CBA, on the basis of two clauses within the Welfare and Pension Trust Agreements. One such clause states:

The Trustees are authorized to extend the coverage of this Restated Agreement and Declaration of Trust to *such other Employers as the Trustees shall agree upon,* provided such Employers are required and agree to conform to the terms and conditions hereof and to make Employer Contributions pursuant to a Collective Bargaining Agreement with a Union.

(Joint Ex. 10, § 3.20) (emphasis added). ⁵ As Hope construes those provisions, it was not bound to the Trust Agreement until Plaintiffs actively exercised their powers under Section 3.20, *i.e.,* until Plaintiffs "agreed" to extend coverage to Hope. Hope reasons that because Plaintiffs were unaware of the CBA prior to October 2001, they could not have agreed to extend coverage to

Hope before that time and are not entitled to benefits for that period.

5   The other provision states, in relevant part, "nothing herein shall require the Trustees to extend the coverage of this Restated Trust Agreement to every Employer which is a party to a Collective Bargaining Agreement with the Union or, having excluded such coverage, to continue to do so." (Joint Ex. 11, Art. III, § 3.18.)

[*15] Plaintiffs' only response to this argument is to rely on the provisions of the CBA.

The Employer shall contribute into a trust set up by trust agreements now in effect in the aforementioned Local Unions for the payment of Health and Welfare or Pension benefits, as the case may be, as determined by the appropriate Board of Trustees, the amounts shown . . . below per week for an employee covered by this Agreement, in accordance with the requirements set forth in the appropriate Appendix of this Article.

(Joint Ex. 9, Art. 16, § 16.1) Hope admits that the CBA states that the Employer "shall contribute contributions to the Health and Welfare Funds as set forth in Article 16 . . . on behalf of each regular employee covered by the Agreement" and that the CBA requires "each Employer to pay into the Pension Fund the amount for each stated in Article 16 . . . as of the appropriate date stated therein for each regular employee covered by this Agreement who performs work on two calendar days and any calendar week." (Def.'s S.M.F., PP 51, 52.)

Hope's suggestion that it was not obligated to make contributions until Plaintiffs agreed to extend benefits is inconsistent with its [*16] admission that Article 16 of the CBA mandated contributions to the Funds by employers. Moreover, if Hope's obligation was not triggered until Plaintiffs' "agreement," Sinese's purported oral side agreement with the union would have been meaningless. Considering both the CBA and the Trust Agreements in their entirety, I could not be persuaded that Plaintiffs were required to take any affirmative steps before Hope was obligated to make contributions.

For these reasons, I find that Hope was obligated under the plain language of the CBA to make contributions on behalf of employee-owner Sinese for the entire period of the CBA (within the applicable statute of limitations) and that Sinese offers no valid defense for his failure to make contributions. Plaintiffs' motion for

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

summary judgment in the amount of $ 184,169.82 is granted. [6]

> 6  Hope did not raise any objections to the calculations used to reach this figure.

### Contributions for Subcontractors

Pursuant to Article 24 of the CBA, Plaintiffs also [*17] seek contributions for several owner-drivers to whom Hope subcontracted work. Alternatively, Plaintiffs argue that Hope breached Article 17 of the CBA by subcontracting work when it employed less than two individuals and claim they are entitled to damages to compensate them for the losses sustained by this breach. Hope contends that the owner-drivers were independent contractors for whom no contributions were required and for whom contributions would be illegal under ERISA and the LMRA.

Section 515 of ERISA "requires employers to comply with the terms of their agreements to make contributions to funds," *Central States, Southeast & Southwest Areas Pension Fund v. Transport, Inc.,* 183 F.3d 623, 627 (7th Cir. 1999) (citation omitted), to the extent that such terms are not inconsistent with the law. *See Central States, Southeast & Southwest Areas Pension Fund v. Hartlage Truck Serv., Inc.,* 991 F.2d 1357, 1360 (7th Cir. 1993). Section 302 of the LMRA prohibits an employer from contributing to a trust fund "on behalf of, or for the benefit of, anyone ineligible to receive benefits from those funds." *Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki,* 44 F.3d 451, 460 (7th Cir. 1994) [*18] (citations omitted). Nonetheless, a collective bargaining agreement may require employees to make contributions to funds based on the hours worked by non-employee subcontractors without violating Section 302. *Walsh v. Schlecht,* 429 U.S. 401, 405, 410, 97 S. Ct. 679, 50 L. Ed. 2d 641 (1977). "Although an employer would violate section 302 by permitting subcontractors to participate in the trust fund benefits, the employer would not violate section 302 by making contributions to the trust funds measured by the hours worked by these subcontractors, so long as only employees participated in these benefits." *Chicago Painters & Decorators Pension v. Karr Bros., Inc.,* 755 F.2d 1285, 1289-90 (7th Cir. 1985) (citing *Walsh,* 429 U.S. at 410).

I must first consider whether the CBA required Hope to contribute to the funds on behalf of the owner-drivers to whom it subcontracted work; if I find this to be the case, I must determine if the contributions called for in the CBA were permissible. *Mazzei v. Rock-N-Around Trucking, Inc.,* 246 F.3d 956, 960, 961 (7th Cir. 2001) (citations omitted); *see also Mrowicki,* 44 F.3d at 458, 460. The following provisions [*19] of the CBA are relative to this analysis.

Article 16: Health and Welfare and Pension

16.1. The Employer shall contribute into a trust set up by trust agreements now in effect . . . for the payment of Health and Welfare or Pension benefits . . . the amounts shown in 16.2 below per week for an employee covered by this agreement.

Appendix A: Health and Welfare

A.1. Each Employer shall pay the amount per week stated in Article 16 . . . as of the appropriate date stated therein for each regular employee covered by this Agreement who performs any work in such week into a trust fund . . . for the payment of Health and Welfare benefits.

Appendix B: Pension

B.2-1. Each Employer shall pay into the Pension Fund the amount per week stated in Article 16 . . . as of the appropriate date stated therein for each regular employee covered by this agreement who performs work on any two (2) calendar days in any calendar week.

Article 17: Work Preservation and Protection of Standards

17.1. For the purpose of preserving work and job opportunities for employees covered by this Agreement . . . the Employer agrees that no operation, work or services of the [*20] kind, nature or type covered by, or presently performed, by the Employer will be subcontracted, transferred, diverted or assigned in full or in part . . . by the Employer . . . unless specifically provided or permitted in this agreement.

17.2. The term "overflow work" as provided herein, is defined as any work in excess of work performed by the average number of employees covered by this Agreement . . . but, in no event, less than two employees. The Employer may subcontract work when all of its regular employees are fully employed. Overflow work may be performed by persons other than the Employer's employees, provided that such subcontracting is not used as a subterfuge to evade the provisions of this

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

agreement, and is done in accordance with this Article. Owner-operators or other persons performing overflow work shall be paid no less than an amount equal to the wages and fringe benefits being paid to employees covered by this Agreement exclusive of truck rental and lease cost.

Article 24: Owner-Drivers

24.1. Owner-drivers operating their own vehicles and who are not certified carriers with proper Illinois Commerce Commission authority are covered within the terms and [*21] conditions of this Agreement, including Union security, hours, wages, overtime, Health and Welfare and Pension and working conditions . . .

24.1-3. The Employer reserves the right to control the manner, means and details of and by which such Owner-Driver performs his services, as well as the ends to be accomplished.

24.1-4. Such Owner-Driver shall receive the full wages, supplemental allowances, and all working conditions provided in this Agreement and shall receive as a minimum salary after payment of all direct and indirect operating expenses (including contributions to the Health and Welfare and Pension Fund) the sum equal to the amount he would have received for the time he would have worked as an hourly rated driver.

24.1-6. In no event shall such Owner-Driver's wages be paid on a percentage basis.

(Joint Ex. 9.) Under the contract's clear language, Hope was obligated to treat owner-drivers doing work covered by the CBA as if they were employees and were required to make contributions to the Health and Welfare and Pension funds unless the owner-drivers fell under Article 17's subcontracting provision. [7] (Joint. Ex. 9, Art. 24.) *Cf. Mrowicki*, 44 F.3d at 458 [*22] (finding that the "plain meaning" of similar contractual language required that "all individuals who owned and operated single trucks and who were engaged to perform services covered by the CBAs were, unless they were 'used as subcontractors' . . . to be carried on their employers' payrolls and be regarded as 'employees' covered by all the terms and conditions of the CBAs"). I turn next to the legality of these provisions.

[7] Throughout its briefs Hope refers to its owner-drivers as subcontractors, but its argument with respect to the legality of the contributions required by the CBA turns on Articles 16 and 24, so I assume for this argument that Hope considers its owner-drivers independent contractors falling within Article 24. I address later Hope's alternative argument that the owner-drivers were true subcontractors within the meaning of Article 17.

In *Mazzei*, the Seventh Circuit considered a contract similar to the one at issue in this case, with clauses almost identical to Article 16 (Contributions to [*23] Health and Welfare and Pension Funds) and Article 24 (Owner-drivers). 246 F.3d at 960. Reviewing the contract, the Court held that "there can be no mistaking the fact that the CBA attempts to impose an obligation on [the defendant employer] to contribute to the Funds for each of its owner-drivers." *Id.* at 960-61. Like the CBA in this case, the CBA in *Mazzei* required contributions to the Health and Welfare Fund for each employee covered by the agreement, though the exact language of the CBA differed. *See id.* at 962 (observing that the CBA required contributions "for each employee . . . who performs work on any two calendar days in any calendar week, *regardless of the number of hours worked*") (emphasis in original). [8] As the *Mazzei* Court noted, "the measure of these contributions has no relation to the number of hours these individuals actually work." *Id.*

[8] A similar provision governed contributions to the pension fund. *Id.*

*Mazzei* distinguished [*24] this requirement from the contributions upheld in *Walsh*, concluding that *Walsh* only permitted contributions (regardless of the employment status of the employer's workers) when the amounts of the contributions were measured by the number of hours worked. *Id.* at 962. Since the agreement at issue in *Mazzei* did not base contributions on the number of hours worked, the Court concluded that "the employment status of [the employer's] owner-drivers will determine the legality of the contributions under the LMRA." *Id.* In other words, *Walsh* was inapplicable and common law principles governing the status of independent contractors determine whether the required contributions were permissible. *Id.* at 962-63. As the contract language in this case is nearly identical to the language at issue in *Mazzei*, I must apply the same analysis. Therefore, I turn to common law agency principles to determine the employment status of Hope's owner-drivers and whether the CBA mandates impermissible contributions. [9]

[9] The CBA in this case does not contain the words "regardless of the number of hours

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

worked." *Cf. Mazzei* at 962. Nevertheless, those words are not necessary for me to reach the same outcome. The plain language of Hope's CBA establishes that the contributions outlined in Section 16.2-1 (Health and Welfare) and 16.2-2 (Pension) do not depend on the number of hours worked. Rather, the CBA requires contributions at fixed, weekly amounts so long as any regular employee performs "any work in such week" (Health and Welfare) or performs "work on any two (2) calendar days in any calendar week." (Joint Ex. 9, Art. 16, App. A, B.)

[*25] The Supreme Court has adopted a "common-law test for determining who qualifies as an 'employee' under ERISA." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992). Whether Hope's owner-drivers are employees or independent contractors turns on a multi-part test in which "the employer's right to control is the most important [factor]." *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 747 (7th Cir. 1998) (internal quotation and citation omitted). The other factors include:

> the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, [] responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, [] method and form of payment and benefits, and [] length of job commitment and/or expectations.

*Mazzei*, 246 F.3d at 963 (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).

Hope's owner-drivers owned their own trucks, worked for other employers, were responsible for the costs of storage, maintenance, gas, and insurance on the trucks, and could [*26] refuse work assignments from Hope without penalty. Under the Seventh Circuit's test, Hope's owner-drivers are quite clearly independent contractors. *See Mazzei*, 246 F.3d at 964 (employer's similar degree of control over owner-drivers amounted to little more than a "basic level of supervision," owner-driver's use of own trucks and ability to refuse work further demonstrated minimal control by employer, and owner-driver's payment of storage, maintenance, gas and insurance are "strong indication" that drivers were independent contractors) (internal quotations and citation omitted). Employers cannot be required to contribute to welfare and pension funds for owner-drivers who are independent contractors when the contributions are not

measured by the hours worked by the independent contractors. *Mazzei*, 246 F.3d at 965. Therefore, I must deny Plaintiffs' motion for summary judgment, as the contributions called for in the CBA violate the LMRA. *Cf. Mrowicki*, 44 F.3d at 461 (contributions based on hours worked by independent contractors did not violate LMRA and could be enforced under ERISA).

There remains, however, the issue of whether Plaintiffs [*27] are entitled to damages based on Hope's breach of the CBA. Plaintiffs argue that Hope breached the CBA when it hired sub-contractors in violation of Article 17.2, which required Hope to employ at least two employees before subcontracting work, and when it paid those subcontractors on a percentage basis, which is prohibited under Article 24.1-6. Article 17, entitled "Work Preservation and Protection of Standards," is a subcontracting clause defining the conditions in which a signator employer can subcontract bargaining unit work. It protects the bargaining unit from an employer's efforts to receive indirectly cheaper labor than called for under the terms of the contract. Faced with overflow work, Hope subcontracted with owner-drivers rather than hire additional employees, whom Hope would have been required to pay on an hourly, rather than a per-ton, basis and for whom Hope would have been required to extend other union benefits, including contributions to the Funds. Plaintiffs are entitled to damages for Hope's breach of contract. The appropriate measure of those damages are the contributions Hope would have made had it hired additional employees rather than hiring subcontractors in [*28] violation of the CBA.

Hope relies on *Woldman v. County Line Cartage Inc.*, 2003 U.S. Dist. LEXIS 24708, No. 01 C 9414, 2003 WL 22995161 (N.D. Ill. Dec. 16, 2003) for the proposition that it should not be held liable for contributions despite any breach. In *Woldman*, Judge Hibbler denied the plaintiff funds' demand for contributions despite the employer's breach of contract by hiring subcontractors. Had the employer properly hired subcontractors, the plaintiff funds still would not have received any contributions because the CBA did not require contributions for properly hired and compensated subcontractors. In this case, the CBA prohibited Hope, a corporation with fewer than two employees, from hiring subcontractors. (Joint Ex. 11, Art. 17.) By improperly subcontracting overflow work to owner-drivers, Hope breached the contract in a manner that imposed costs (in the form of lost contributions for employees Hope was required to hire before subcontracting work) on Plaintiffs and they are entitled to damages to compensate them for those losses. *See Karr Bros.*, 755 F.2d at 1290 ("the district court correctly required defendant to pay plaintiffs the amount that defendant would have [*29] been required to contribute to the trust funds if it had complied with the col-

2005 U.S. Dist. LEXIS 27866, *; 178 L.R.R.M. 2513;
151 Lab. Cas. (CCH) P10,580; 36 Employee Benefits Cas. (BNA) 1747

lective bargaining agreements and hired employees to do bargaining unit work").

For this reason, I grant Plaintiffs' motion for summary judgment in the amount of $ 22,619.00 based upon Hope's impermissible subcontracting of work to owner-drivers Maves Trucking, K&N Trucking, Larry Fultz, David Steffes, Mike Nelson and Terry Jacobsen.

### Conclusion

Plaintiffs are entitled to summary judgment against Hope Cartage, Inc., for the audit period January 1, 1992 through December 31, 2002 in the amounts of $ 184,169.82 for unpaid contributions on John Sinese, interest on those contributions and the higher of interest or liquidated damages pursuant, to 1132(g)(2)(A) - (C). Plaintiffs are also entitled to summary judgment on Plaintiffs' claims for contributions based upon owner-drivers hired by Hope during the same period in the amount of $ 22,619.00 for unpaid contributions pursuant to principles of contract law. Plaintiffs' Motion to Strike

Portions of Hope Cartage, Inc.'s Motion for Summary Judgment is denied as moot.

ENTER:

James B. Zagel

United States District Judge

DATE: November 15, 2005

[*30] **JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that summary judgment is entered in favor of plaintiffs and against defendant, Hope Cartage, Inc. in the amount of $ 206,788.82, plus interest. Defendant's motion for summary judgment is denied.

Date: 11/15/2005